# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|                                    |     |                                  |
| ---------------------------------- | --- | -------------------------------- |
| DONALD MARTIN, JR.,                | )   |                                  |
|                                    | )   |                                  |
|     Plaintiffs | )   | No.: 13-834C                     |
|                                    | )   |                                  |
| v.                                 | )   | Judge Patricia E. Campbell-Smith |
|                                    | )   |                                  |
| THE UNITED STATES OF AMERICA       | )   | Collective Action                |
|                                    | )   |                                  |
|     Defendant. | )   |                                  |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION

## FOR PARTIAL SUMMARY JUDGMENT

Heidi R. Burakiewicz
Mehri & Skalet, PLLC
1250 Connecticut Avenue NW, Suite 300
Washington, D.C. 20036
(202) 822-5100 (phone)
(202) 822-4997 (fax)
hburakiewicz@findjustice.com
Counsel of Record for Plaintiffs

Steven A. Skalet
Michael Lieder
Mehri & Skalet, PLLC
1250 Connecticut Avenue NW, Suite 300
Washington, D.C. 20036
(202) 822-5100 (phone)
(202) 822-4997 (fax)
sskalet@findjustice.com
mlieder@findjustice.com
Of Counsel for Plaintiffs

# TABLE OF CONTENTS

I.     QUESTIONS PRESENTED .............................................................................. 1

II.    STATEMENT OF THE CASE ...................................................................... 1

III.   STATEMENT OF UNDISPUTED FACTS ................................................... 3

     A.      Background Facts ............................................................................... 3

     B.      Facts Related to Issue of Whether the Government Is Liable for Liquidated Damages ............................................................................. 6

     C.      Facts Related to Whether the Government Was Able to Calculate the Correct Amount of Overtime Compensation Before the Members' Regularly Scheduled Paydays ............................................................ 17

IV.   SUMMARY OF THE ARGUMENT ........................................................... 19

     A.      The Government Is Liable for Liquidated Damages. ...................... 19

     B.      The Government Does Not Qualify for the Exemption for Employers Unable to Determine the Amount of Overtime Compensation Due. ............................ 21

V.     ARGUMENT .............................................................................................. 22

     A.      The Government Cannot Establish that It Is Entitled to the Reduction or Elimination of Liquidated Damages ................................................. 22

         1.      The Stipulated and Undisputed Facts Establish that the Government Did Not Act in Good Faith. ................................................. 24

             a.      The Government did not act in good faith because it did not attempt to ascertain what the FLSA required and attempt to comply with the requirement. ................................. 24

             b.      The Anti-Deficiency Act did not exempt the Government from meeting the "good faith" element in order to obtain a reduction or elimination of liquidated damages. ...................................... 26

                 i.      There are no special rules for public employers. ......... 26

                 ii.      Agencies failed to attempt to attempt to pay their employees in compliance with the FLSA. .................... 26

                 iii.      Congress failed to ensure that employees were paid in compliance with the FLSA. ........................................... 27

                 iv.      The DOL was aware that the Government was violating the FLSA. .................................................................... 30

2.      The Stipulated and Undisputed Facts Establish that the Government Did Not Have a Reasonable Basis for Believing that It Was Complying with the FLSA. ........................................................................................ 32

3.      The Court Should Not Reduce, Let Alone Eliminate, Liquidated Damages Under the Facts of this Case. ................................................. 36

B.    The Government Cannot Establish that It Was Unable to Compute the Correct Compensation for Overtime Worked by Members During the 2013 Government Shutdown by Their Regular Paydays. ....................................... 38

VI.   CONCLUSION .............................................................................................................. 40

**Cases**

*"Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740 (E.D.N.Y. 1985) ..................................... 31

*Abbey v. United States*, 106 Fed. Cl. 254 (2012), *rev'd on other grounds*, 2014 U.S. App. LEXIS

5303 (Fed. Cir. Mar. 21, 2014)……………………………………….……..……………...23

*Adams v. United States*, 350 F.3d 1216 (Fed. Cir. 2003).. .......................................................... 23

*Angelo v. United States*, 57 Fed. Cl. 100 (2003)................................................. ...….23, 24, 25, 36

*Beebe v. United States*, 640 F. 2d 1283……………………………………...…………….24, 32

*Biggs v. Wilson*, 828 F. Supp. 774 (E.D. Cal. 1991), *aff'd*, 1 F.3d 1537 (9ᵗʰ Cir. 1993)….………9

*Biggs v. Wilson*, 1 F.3d 1537 (9ᵗʰ Cir. 1993.......…………………………………….…...……*passim*

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945)………..……………………….…16, 23

*Brooks v. Village of Ridgefield Park*, 185 F.3d 130 (3d Cir. 1999).......................................16, 33

*Cahill v. City of New Brunswick*, 99 F. Supp. 2d 464 (D.N.J. 2000).......................................... ..39

*Caldman v. California*, 852 F. Supp. 898 (E.D. Cal. 1994)………………..………….……*passim*

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................ 22

*Council 13 v. Commonwealth of Pennsylvania*, 954 A.2d 706, 715 (Pa. Commw. Ct. 2008), *rev'd*

*in part*, 604 Pa. 352, A.2d 63 (2009)………………….………………………..………..15

*Council 13 v. Commonwealth*, 604 Pa. 352(Pa. 2009) ............................................. 10, 15, 33, 34

*Dominici v. Bd. of Educ.*, 881 F. Supp. 315 (N.D. Ill. 1995)........................................................ 39

*Dougherty v. United States*, 18 Ct. Cl. 496 (1883)........................................................... 1, 20, 35

*Ferris v. United States*, 27 Ct. Cl. 542 (1892) ................................................................. 1, 20, 35

*Herman v. RSR Sec. Servs.,* 172 F.3d 132 (2d Cir. 1999)…....................................................... 24

*Hoffmann-La Roche Inc. v. Sperling*, 493 U. S. 165 (1989)....................................................... 27

*Huggins v. United States*, No. 95-285 C, 2005 U.S. Claims LEXIS 525

   (Fed. Cl. Aug. 16, 2005 ................................................................................... 36

*J.A. Jones Constr. Co. v. United States*, 182 Ct. Cl. 615 (1968) ................................. 31

*Mitchell v. Lublin*, 358 U.S. 207 (1959) ................................................................. 37

*Moreno v. United States*, 88 Fed. Cl. 266 (2008)………..………………………….........24, 25

*Ortega v. Due Fratelli, Inc.,* 2015 U.S. Dist. LEXIS 161053 (N.D. Ill. Dec. 1, 2015)………… 39

*Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942)..……………………………..23, 37

*Pickett v. Beard*, Case No. 1:13-CV-0084 AWI BAM, 2014 U.S. Dist. LEXIS 15066

   (E.D. Cal. Feb. 5, 2014)…………………………………….. …………………….…..38

*Powers v. Centennial Communs. Corp.*, 679 F. Supp. 2d 918 (N.D. Ind. 2009)………………...39

*Prickett v. Dekalb County*, 349 F.3d 1294 (11th Cir. 2003)…………………….…………………37

*Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181 (2012)……………………………… *passim*

*Shea v. Galaxie Lumber, 152 F.3d 729 (7th Cir. 1998)*…………………………………………36

*Simanski v. Sec'y of HHS*, 671 F.3d 1368 (Fed. Cir. 2012)………..…………………………..22

*Thomas v. Howard Univ. Hosp.*, 39 F.3d 370 (D.C. Cir. 1994)……………………………32

*Tyson Foods, Inc. v. Bouaphakeo*, 194 L. Ed. 2d 124 (2016)…………..……………………… 27

*White v. Davis*, 30 Cal. 4th 528 (Cal. 2003)…………….…………………………13, 22, 33

**Statutes**

25 U.S.C. § 450 *et seq.*,...................................................................................... 34, 36

Anti-Deficiency Act, 31 U.S.C. § 1341(a)......................................................... ..*passim*

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*………..………………………………*passim*

29 U.S.C. § 203……………………………………………. …………………………...20,33

29 U.S.C. § 207……………………………………………..……………………….......33

29 U.S.C. § 216(b)…………………………………………….……………………..8, 23, 31

29 U.S.C. § 260………………………………………………..………………......*passim*

Pub. L. 93-259, §§ 6(a), 13(e), 88 Stat. 58 (April 8, 1974) ........................................................ 33

**Regulations**

29 C.F.R. § 790.21(b) ............................................................................................. 11, 23, 38

29 C.F.R. § 7738.106 ...................................................................................................... 11

# I. QUESTIONS PRESENTED

1.      Are members of the collective action entitled to liquidated damages under the FLSA when (a) the Government failed to investigate whether it was in compliance with the FLSA before deciding not to pay them on their regularly scheduled paydays and (b) the Government's only excuse for not making timely payment, the Anti-Deficiency Act, 31 U.S.C. § 1341(a), "do[es] not affect the rights in this court of the citizen honestly contracting with the Government" and does not "cancel [the Government's] obligations." *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2193 (2012) (quoting *Dougherty v. United States*, 18 Ct. Cl. 496, 503 (1883) and *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892))?

2.      Can the Government show that it was not able to compute by their regularly scheduled payday(s) the correct amount of compensation for any members of this collective action who worked overtime between September 29 and October 5, 2013?

# II. STATEMENT OF THE CASE

Five Plaintiffs filed the Complaint initiating this case on October 24, 2013 (ECF No. 1) as a collective action on behalf of themselves and all other "excepted employees" who had performed work during October 1-5, 2013, the first five days of the partial Government shutdown arising out of the Government's budget impasse, but who had not been paid for that work on their regularly scheduled paydays.  Plaintiffs claim that the late payment of their wages violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et al.*, and for such violation they are entitled to statutory liquidated damages.

The Government moved to dismiss.  Def's Mot. to Transfer and Mot. to Dismiss, March 11, 2014, ECF No. 23.  On July 31, 2014, the Court issued an Opinion and Order (ECF No. 38) addressing that motion that reached the following conclusions, among others:

- The Government violated the FLSA for any excepted employee who was classified as non-exempt under the FLSA[1] and was not paid the minimum wage for all hours worked during the week of September 29, 2013 through October 5, 2013 on the employee's regularly scheduled payday. Op. and Order, July 31, 2014, ECF No. 38, at 7-15;

- The Government also violated the FLSA for any excepted employee who was classified as non-exempt under the FLSA and was not paid for overtime worked during the week of September 29, 2013 through October 5, 2013 on the employee's regularly scheduled payday, except to the extent (if at all) that the Government was not able to compute by that payday the correct amount of compensation that the employee was owed for any overtime worked between September 29 and October 5, 2013, an issue that the Court could not determine on the motion to dismiss. *Id.* at 17-18; and

- The Court could not determine on the motion to dismiss whether the Government is liable to pay employees as to whom it violated the FLSA "liquidated damages" over and above their regular pay. *Id.* at 12-13, 21-23.

Plaintiffs' motion for partial summary judgment addresses the two issues left open by the Opinion and Order of July 31, 2014, and identified in the second and third bullet points above. If the Court rules that Plaintiffs are entitled to liquidated damages, the final stage of the proceedings before this Court will be the determination of the amount, if any, of liquidated damages that each Plaintiff and Opt-in Plaintiff is entitled to receive. A total of approximately 24,391 persons filed Consent Forms to join the lawsuit. Redacted De-Duplicated List of Opt-In

---

[1]    The Court dismissed the claims brought on behalf of employees classified as exempt under the FLSA. *Id.* at 19-20.

Plaintiffs, Jan. 21, 2016, ECF No. 144-1. If the Court rules that Plaintiffs are not entitled to liquidated damages, the proceedings before this Court will end because Plaintiffs and Opt-in Plaintiffs do not have any other compensable injuries under the FLSA.

## III. STATEMENT OF UNDISPUTED FACTS

### A. Background Facts

1. Because of a lapse in appropriations, the Federal Government ceased certain non-essential operations and services from October 1 through October 16, 2013 (the 2013 Government shutdown). Certain Government employees funded through annual appropriations were designated as "excepted" employees for purposes of the Anti-Deficiency Act, 31 U.S.C. § 1341, *et seq*., and required to work during the 2013 Government shutdown because they would provide services that involve "the safety of human life or the protection of property." 31 U.S.C. § 1342. Stipulated Fact ("SF") No. 1, March 31, 2016, ECF No. 151.

2. Some of the "excepted" employees funded through annual appropriations also were classified as "non-exempt" under the FLSA. Baham Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-6; Ballard Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-7; Clapper Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-8;[2] Chamberlain Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-9; Cook Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-10; Copeland Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-11; Jennings Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-12; Jones Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-13; Melvin Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-14; Plank Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-15; Roberts Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-16; Rowell Decl., ¶ 2, Jan. 28, 2014, ECF No. 14-17; Torrain Decl., ¶

---

[2] Plaintiffs' counsel submitted unsigned versions of the Ballard and Clapper declarations to the Court on January 28, 2014, and never submitted signed replacements, for which Plaintiffs apologize to the Court. But even if the Court excludes those declarations, each of the factual statements that they support are amply supported by other declarations.

2, Jan. 28, 2014, ECF No. 14-18.  These excepted non-exempt employees are called "Affected

Employees" in this filing.

3.	Four of the original Plaintiffs in this case are Affected Employees.  2d Am.

Cmpl., May 8, 2014, ECF No. 29-1; Roberts Decl., ¶ 1, Jan. 28, 2014, ECF No. 14-16.

4.	Over 24,000 persons purporting to be Affected Employees have filed Consents to

Join the case.  Redacted De-Duplicated List of Opt-In Plaintiffs, Jan. 21, 2016, ECF No. 144-1.

The Plaintiffs identified in the third paragraph and all Opt-In Plaintiffs identified in this

paragraph who are Affected Employees are called the "Members" in this filing.

5.	Typically, the Government pays Members biweekly.  The first pay period affected

by the 2013 Government shutdown, designated as Pay Period 19, commenced on Sunday,

September 22, 2013, and ended Saturday, October 5, 2013.  Nat'l Finance Ctr., Pay Period

Calendar 2013, at https://www.nfc.usda.gov/ppcalendar/ppcal2013.htm#pp7 (last visited Apr. 20,

2016).  Each Member's regularly scheduled payday for Pay Period 19 was sometime in October

after October 5, 2013, with the exact date dependent on the agency for which the employee

worked.  Baham Decl., ¶ 4, Jan. 28, 2014, ECF No. 14-6; Ballard Decl., ¶ 4, Jan. 28, 2014, ECF

No. 14-7; Clapper Decl., ¶ 4, Jan. 28, 2014, ECF No. 14-8; Chamberlain Decl., ¶ 4, Jan. 28,

2014, ECF No. 14-9; Cook Decl., ¶ 4, Jan. 28, 2014, ECF No. 14-10; Copeland Decl., ¶ 4, Jan.

28, 2014, ECF No. 14-11; Jennings Decl., ¶ 4, Jan. 28, 2014, ECF No. 14-12; Jones Decl., ¶ 4,

Jan. 28, 2014, ECF No. 14-13; Melvin Decl., ¶ 4, Jan. 28, 2014, ECF No. 14-14; Plank Decl., ¶

4, Jan. 28, 2014, ECF No. 14-15; Roberts Decl., ¶ 4, Jan. 28, 2014, ECF No. 14-16; Rowell

Decl., ¶ 4, Jan. 28, 2014, ECF No. 14-17; Torrain Decl., ¶ 4, Jan. 28, 2014, ECF No. 14-18.

6.	The Government understood that during a lapse in appropriations the Anti-

Deficiency Act, 31 U.S.C. § 1341(a), prohibited payment of wages for work performed by

Affected Employees during the 2013 Government shutdown until funds had been appropriated. SF No. 2.

7.  The Government did not pay Members for work performed between October 1 and October 5, 2013 (the "Five Days"), on their regularly scheduled paydays for that work. SF No. 7.

8.  Between September 29 and October 5, 2013 (the "Affected Week"), the minimum wage was $7.25 per hour. U.S. Dep't of Labor Wage & Hour Division, "Minimum Wage," at http://www.dol.gov/whd/minimumwage.htm (last visited Apr. 20, 2016). The minimum wage for Members who worked 40 hours during the Affected Week was $290.

9.  Because the Government did not pay Members for work performed during the Five Days on their regularly scheduled paydays for Pay Period 19, some Members did not receive the minimum wage, or $290, for work performed during the Affected Week on their regularly scheduled paydays. Baham Decl., ¶ 5, Jan. 28, 2014, ECF No. 14-6; Ballard Decl., ¶ 5, Jan. 28, 2014, ECF No. 14-7; Clapper Decl., ¶ 5, Jan. 28, 2014, ECF No. 14-8; Chamberlain Decl., ¶ 5, Jan. 28, 2014, ECF No. 14-9; Jennings Decl., ¶ 5, Jan. 28, 2014, ECF No. 14-12; Jones Decl., ¶ 5, Jan. 28, 2014, ECF No. 14-13; Plank Decl., ¶ 5, Jan. 28, 2014, ECF No. 14-15; Torrain Decl., ¶ 5, Jan. 28, 2014, ECF No. 14-18.

10. After the 2013 Government shutdown ended, the Government retroactively paid Members their basic wages for regular, non-overtime work performed during the Five Days on or before the employees' next regularly scheduled payday, but did not pay them any liquidated damages, attorney fees or expenses. SF No. 8.

11. After the 2013 Government shutdown ended, but not necessarily by the next regularly scheduled payday, the Government retroactively paid Affected Employees their wages

for overtime work performed during the Five Days, but again did not pay them any liquidated damages, attorneys' fees or expenses. Baham Decl., ¶¶ 6-8, Jan. 28, 2014, ECF No. 14-6; Chamberlain Decl., ¶¶ 6-8, Jan. 28, 2014, ECF No. 14-9; Cook Decl., ¶¶ 6-8, Jan. 28, 2014, ECF No. 14-10; Plank Decl., ¶¶ 6-8, Jan. 28, 2014, ECF No. 14-15; Roberts Decl., ¶¶ 6-8, Jan. 28, 2014, ECF No. 14-16; Rowell Decl., ¶¶ 6-8, Jan. 28, 2014, ECF No. 14-17.

12.     Some Members have submitted declarations describing injuries that they suffered as a result of the 2013 Government shutdown.  These injuries include having to cancel medical appointments, not purchase medicines, not purchase normal groceries, delay periodic payments on loans and incur financial penalties, and decline educational opportunities for their children. Op. and Order, July 31, 2014, ECF No. 38, at 13 n.11 (noting that Members had described how their salaries left them "narrow margins" making it financially difficult when they "incurred child care expenses … and unexpected health-related expenses" during the 2013 Government shutdown); *see* Ballard Decl., ¶¶ 7-12, Jan. 28, 2014, ECF No. 14-7; Chamberlain Decl., ¶ 9, Jan. 28, 2014, ECF No. 14-9; Copeland Decl., ¶¶ 7-12, Jan. 28, 2014, ECF No. 14-11; Jennings Decl., ¶¶ 7-8, Jan. 28, 2014, ECF No. 14-12; Jones Decl., ¶¶ 7-10, Jan. 28, 2014, ECF No. 14-13; Melvin Decl., ¶¶ 7-12, Jan. 28, 2014, ECF No. 14-14; Rowell Decl., ¶¶ 9-12, Jan. 28, 2014, ECF No. 14-17; Torrain Decl., ¶ 7, Jan. 28, 2014, ECF No. 14-18.  The Government has not deposed those Members or produced any documents contesting their allegations.  Lieder Decl., ¶ 3.

**B.      Facts Related to Issue of Whether the Government Is Liable for Liquidated Damages**

13.     This Court already has concluded that the Government violated the FLSA when it did not pay Members the minimum wage for work performed during the Affected Week. July 31, 2014 Op. and Order, at 7-15.

14.     Based upon the information received from relevant personnel and review of the relevant documents, the agencies that advise the Federal Government on the implementation of labor law and policy did not prior to or during the 2013 Government shutdown consider whether requiring Affected Employees to work during the Affected Week without paying them minimum or overtime wages on their regularly scheduled paydays for that work would violate the FLSA.  Based upon the information described above, the Government is not aware of any other agency that considered the issue prior to or during the 2013 Government shutdown.  SF No. 3.

15.     The Government did not seek a formal legal opinion regarding how to meet its obligations under both the Anti-Deficiency Act and FLSA as to Affected Employees who were required to work during the shutdown.  SF No. 4.

16.     On September 28, 2013, two days before appropriations would end, the Pay our Military Act ("POMA") was introduced in the House of Representatives.  POMA appropriated money until regular appropriation acts were adopted to pay members of the Armed Forces and to pay civilian personnel of the Department of Defense and the Coast Guard and even of contractors whom the Secretary determines are providing support to members of the Armed Forces.  The bill passed the House unanimously on September 29, passed the Senate by unanimous consent on September 30, and was signed by the President on the eve of the shutdown.  Actions Overview: H.R.3210 — 113th Congress (2013-2014), at https://www.congress.gov/bill/113th-congress/house-bill/3210/actions; P.L. 113-39.16.

17.     After making several objections, the Government stated that it would produce responsive, non-privileged documents in the possession, custody or control of five agencies – the Department of Labor, Department of Defense, Office of Personnel Management, Department of Justice, and Office of Management and Budget – in response to Plaintiffs' requests that it

produce "all documents that analyze or address the possibility of extending POMA, or the bill that became POMA, to other excepted employees," and "all documents related to any communications … between any agency of the Government and any Congressional member or staffperson analyzing or addressing the issue of whether the Government would violate, was violating, or had violated the FLSA during the October 2013 partial shutdown by not paying non-exempt employees minimum or overtime wages on their regularly scheduled paydays."  Ex. M, Defendant's Response to Plaintiffs' First Set of Requests for Production of Documents, at 5-6.  In the meet-and-confer process, these were discussed as the five agencies most likely to possess responsive documents if they existed.  Ultimately, the Government did not produce any documents in response to these requests.  Lieder Decl., ¶ 4.

18.	The Wage and Hour Division (WHD) of the Department of Labor administers the wage and hour provisions of the FLSA with respect to private employment, State governments and political subdivisions of a State.   SF No. 5.

19.	Since at least 1998, the WHD has interpreted the FLSA as follows:

a.	The failure to pay employees of State government required minimum wage and overtime premiums when due – *i.e.*, on the regularly scheduled payday for the work performed – constitutes a violation of the FLSA;

b.	The prompt payment requirement applies to State governments during a budget impasse, whether or not there is a provision of state law that limits expending non-appropriated funds; any such provision provides no defense to this requirement.

c.	Employees may recover liquidated damages pursuant to 29 U.S.C. §§ 216(b) and 260 as a result of a state or local government's  failure to pay them minimum wages and

overtime wages for work performed during a pay period on their regularly scheduled payday for that period.

SF No. 6.

20.    In an opinion letter issued July 20, 1998, the WHD opined "as to whether the failure to pay state employees covered by the [FLSA] on their regular payday constitutes a violation of the Act if the State later pays the employees all wages due, plus liquidated damages."  It began its analysis by stating that "the U.S. Court of Appeals for the Ninth Circuit held in <u>Biggs v. Wilson</u>, 1 F.3d 1537, 1539-41 (1993), <u>cert. denied</u>, 114 S. Ct. 902 (1994), that the FLSA requires prompt payment of the wages due under the Act at the time of the employees' normal payday."  The WHD pointed out that "[s]ubsequently, in <u>Caldman v. State of California</u>, 852 F. Supp. 898, 902 (E.D. Cal. 1994), the court awarded liquidated damages to the employees where the State, subsequent to the district court decision in <u>Biggs</u>, 828 F. Supp. 774 (E.D. Cal. 1991), again failed to make timely wage payments during a budget impasse."  The WHD then announced, "The Wage and Hour Division fully agrees with the decision of the Ninth Circuit."  Shortly afterward, it stated that "the FLSA subjects employers who violate the Act to liability for liquidated damages in the amount of the unpaid wages."  Finally, it summarized:

> In sum, we believe that failure to pay employees required minimum wage and overtime premiums when due – i.e,, on the regularly scheduled payday for the work performed – constitutes a violation of the FLSA, notwithstanding an employer's later payment of all wages due plus an equal amount as liquidated damages.

Ex. A, Opinion Letter dated July 20, 1998, stamped US_MART0000367-68[3]; *see* SF 13

(identifying US_MART0000367-68 as the opinion letter issued by the then Acting Administrator

of the WHD, "except that the name of the original recipient of the letter has been deleted").

21.     Budget impasses in the State of Pennsylvania in 2007 and 2009 resulted in

communications between the United States Department of Labor and representatives of the State

concerning its obligations under the FLSA.  Facts 22-31 *infra*.

22.     According to the Pennsylvania Supreme Court,

> The Commonwealth's fiscal year begins on July 1st of each calendar year and
> ends on June 30th of the next calendar year.…  Article VIII, Section 13 [of the
> Commonwealth's Constitution] requires the General Assembly to adopt the
> budget for the ensuing fiscal year and to make operating budget appropriations.
> Under Section 24 [of the Constitution], the  General Assembly's budget
> appropriations are an essential prerequisite to expending money from the
> Commonwealth's Treasury; that is, without such appropriations, state monies, for
> the most part, may not be spent. Section 24 provides:
>
> > No money shall be paid out of the treasury, except on
> > appropriations made by law and on warrant issued by the proper
> > officers ….

*Council 13 v. Commonwealth*, 604 Pa. 352, 358-59 (Pa. 2009)

23.     As a result of a budget impasse in 2007, certain employees of the State of

Pennsylvania were furloughed for one day.  Ex. B, Emails among WHD employees dated July

15, 2009, stamped US_MART0000561-63, at 562; SF 14-17 (identifying authors and most of

recipients of emails stamped US_MART0000561-63).  The Administrator of the Wage and Hour

Division of the Employment Standards Administration, U.S. Department of Labor sent a letter to

John R. Gordner, the Chairman of the Labor and Industry Committee of the Senate of the

---

[3]     Exhibits are attached to the declaration of Michael Lieder.  Documents with bate stamp
numbers beginning "US_MART" were produced by the Government in response to Plaintiffs'
document production requests.

Commonwealth of Pennsylvania, on August 14, 2007, that addressed questions purportedly

raised by Mr. Gordner in a telephone conversation concerning the Commonwealth's obligations

under the FLSA in connection with the possibility of the State's furloughing employees because

of a budget impasse. As part of his response, the Administrator explained:

> It has been the long-standing position of the Wage and Hour Division that an employer is required to pay covered employees the full minimum wages and overtime due on the regularly scheduled pay day for the workweek in question, and failure to do so constitutes a violation of the FLSA. The courts have held that a cause of action under the FLSA for unpaid minimum wages or unpaid overtime compensation and liquidated damages "accrues" when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends. *See* 29 C.F.R. §§ 790.21(b), 7738.106. *See also Biggs v. Wilson*, 1 F.3d 1537 (9th Cir. 1993); *Caldman v. State of Calif.*, 852 F. Supp. 898 (E.D. Cal. 1994).

Ex. B, Letter from Paul DeCamp dated August 14, 2007, stamped US_MART0000309-10; *see*

SF 13 (identifying US_MART0000309-10 as a letter written by the Administrator acting within

the scope of his duties).

24.     As a result of another budget impasse, the State of Pennsylvania stopped paying

employees for hours worked after July 1, 2009. Unlike in 2007, when employees were

furloughed, this time the State "instruct[ed] employees to continue working with the promise that

they would be paid when the budget impasse was over." Ex. C, Emails among WHD employees

dated September 1, 2009, stamped US_MART0000539-41, at 539; SF 16 (identifying authors

and recipients of emails stamped US_MART0000539-41).

25.     On July 14, 2009, the Wilkes-Barre District Director of WHD sent a Special

Assistant to Pennsylvania's Governor a copy of the July 20, 1998 opinion letter after which "we

had a conversation about our position on the matter as well as the potential consequences of the

Commonwealth's intended actions." Later the same day the Pennsylvania Deputy Secretary of

Labor spoke at length with the Wilkes-Barre District Director of WHD "about the July 20, 1998 opinion letter and the potential consequences of the Commonwealth's intended action." The WHD sent the Deputy Secretary of Labor a copy of the opinion letter as well. *Id.* at 540; Ex. D, Emails among WHD employees dated July 17, 2009, stamped US_MART0000566-67; SF14, 15, 17 (identifying authors and recipients of emails stamped US_MART0000566-67).

26.     On July 14, July 17, and July 20, the Wilkes-Barre District Director of WHD and the Deputy Regional Administrator provided estimates to superiors within the WHD of Pennsylvania's exposure for not paying its employees minimum wages on certain regularly scheduled paydays. Each of the estimates included, in addition to the unpaid minimum wages, a reference to "an equal amount in LDs [liquidated damages]," or similar language. These estimates were internal and pre-decisional. Ex. E, Emails from Alfonso J. Gristina to George C. Ference dated July 14, 2009, stamped US_MART0000535-37, at 535; Ex. D, Emails among WHD employees dated July 17, 2009, stamped US_MART0000566-67; Ex. F, Email from George C. Ference to John L. McKeon and others dated July 20, 2009, stamped US_MART0000538; SF 14-17 (identifying author and recipient of emails comprising exhibits D, E, and F and explaining that the references to "LDs" are to liquidated damages). The Government, however, has not produced any documents in which any employees of the WHD or the Department of Labor indicated that it was incorrect that Pennsylvania was exposed to the possibility of liquidated damages. Lieder Decl., ¶ 5.

27.     In or about July 2009, WHD employees drafted a set of questions and answers concerning FLSA issues raised by the decision of the State of Pennsylvania to instruct employees to continue working during the budget impasse and not to pay them until moneys had been appropriated. SF 19. The questions and answers included:

**Question:**

**Can the U.S. Secretary of Labor bring a suit against Pennsylvania for back wages and for damages?**

Answer:

… The FLSA provides the following methods for recovery of such unpaid minimum wages:

…

- The Secretary of Labor may bring suit for back wages and an equal amount as liquidated damages or for interest on the back wages …; or

- An employee may file a private suit for back pay and an equal amount as liquidated damages, plus attorney's fees and court costs.…

**Question:**

**Would State workers denied their full pay on payday be entitled to recover double-pay for every day their full pay is late?**

Answer:

Consistent with the discussion in the response to Question 1, above, if there is a violation of the FLSA's minimum wage requirements, liquidated (double) damages may be pursued.

…

**Question:**

**Has the Wage and Hour section dealt with this issue before and made a determination in another case?**

Answer:

The WHD opined on the non-payment of wages to state employees in a 1998 letter.

Also, the California Supreme Court held in White v. Davis (2003 WL 1994061 (2003) that an employer must pay its employees who are covered by the FLSA who do not work overtime at the minimum wage rate on payday.  However, if a nonexempt employee works overtime, the FLSA requires the employer to timely

pay the full regular wages for the straight time work, as well as one-and-one-half times that rate for overtime hours.

**Question:**

**Are there any monetary damages the state could suffer as a result of not paying its employees in full on payday?**

Answer:

A successful suit could result in the assessment of liquidated damages, if so ordered by a court of competent jurisdiction, or the assessment of interest on the back wages due (see response to Question 1. Above).

Ex. G, Questions and Answers on Pennsylvania State Budget Impasse, stamped US_MART568-69. These statements were not issued to the public, and were pre-decisional, internal, and preliminary. SF 19. Nonetheless, the Government has not produced any documents in which any employees of the WHD or the Department of Labor indicated that any of these statements concerning Pennsylvania's possible exposure for violations of the FLSA were incorrect in any way. Lieder Decl., ¶ 5.

28. In early August 2009, the State of Pennsylvania adopted a stopgap budget, and employees were paid by mid-August wages for work performed in July. Ex. C, Emails among WHD employees dated September 1, 2009, stamped US_MART0000539-41, at 539; Ex. H, Letter from Associate Solicitor Steven J. Mandel dated August 26, 2009, stamped US_MART0000311-12; SF 10, 16 (identifying authors and recipients of documents stamped US_MART0000311-12, US_MART0000539-41).

29. On July 24, 2009, while the impasse was ongoing, Frank Fisher, the Chief Counsel to Pennsylvania's Governor, wrote to a WHD representative, providing requested payroll data but arguing "that the FLSA does not require it to pay wages and other compensation to its employees until the Legislature has enacted appropriations authorizing those payments." In

support, he cited *Council 13 v. Commonwealth of Pennsylvania*, 954 A.2d 706, 715 (Pa.

Commw. Ct. 2008), *rev'd in part*, 604 Pa. 352, 986 A.2d 63 (2009), which, he stated, "ruled that

'the FLSA does not address the crisis that occurs when a State is deadlocked by a budget

impasse,' and that 'there is no basis for inferring that Congress intended to countenance, let

alone require, a raid upon a State treasury for monies that do not belong to any agency or public

official until the day they are actually appropriated.'"  Ex. I, Letter from Frank A. Fisher dated

July 24, 2009, stamped US_MART0000572-73; SF 20.

      30.    And on July 28, 2009, a private lawyer, Daniel P. O'Meara, wrote a letter on

behalf of the Administrative Office of Pennsylvania Courts to a different WHD representative.

He made a series of practical arguments as to why the Secretary of Labor should not file a

federal lawsuit under the FLSA on behalf of the Pennsylvania judicial employees. Ex. J, Letter

from Daniel P. O'Meara dated July 28, 2009, stamped US_MART0000574-78; SF 21.

      31.    Steven Mandel, the Department of Labor's Associate Solicitor for Fair Labor

Standards, responded to Mr. Fisher and Mr. O'Meara by separate letters dated August 26, 2009.

The legal argument in each letter was identical.  Mr. Mandel stated that "[i]t is the Department's

position that Pennsylvania must make timely payments of minimum wages and overtime pay in

accordance with the Fair Labor Standards Act to any covered employees who work during a

budget impasse."  Ex. H, Letter from Associate Solicitor Steven J. Mandel to Frank Fisher dated

August 26, 2009, stamped US_MART0000311-12; Ex. K, Letter from Associate Solicitor Steven

J. Mandel to Daniel P. O'Meara dated August 26, 2009, stamped US_MART0000313-14; SF 10

(identifying author of letter stamped US_MART0000311-12 and that it was written in response

to the letter from Mr. Fisher); SF 11 (stating that letter stamped US_MART0000311-12 was

written in response to the letter from Mr. O'Meara).  He explained:

Specifically, the Department's longstanding position is that "the FLSA requires prompt payment of the wages due under the Act at the time of the employees' normal payday." July 20, 1998 Wage-Hour Opinion Letter, 1998 WL 1147716. Thus, "an employer is required to pay employees the full minimum wages and overtime due on the regular payday for the workweek in question." *Id.* More than 60 years ago, the Supreme Court, in concluding that liquidated damages under the FLSA cannot be waived, stated that "[t]he necessity of prompt payment to workers of wages has long been recognized by Congress as well as by state legislatures." *Brooklyn Sav. Bank v. Oneil*, 324 U.S. 697, 709 n.20 (1945). Indeed, every court of appeals that has addressed this issue has similarly adopted a "prompt payment" requirement. *See, e.g., Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 135-36 (3d Cir. 1999); *Biggs v. Wilson*, 1 F.3d 1537, 1539, 1540 9th Cir. (1993) (requiring prompt payment to state employees during California's budget impasse).

*Id.* He then concluded:

Accordingly, Pennsylvania is obligated under the FLSA (*see* 29 U.S.C. 203(d) and (x)) to timely pay on a continuing basis any employees the requisite minimum wage and overtime compensation for work performed. ***The prompt payment requirement applies whether or not there is a provision in state law that limits expending non-appropriated funds; any such provision provides no defense to this requirement.***

*Id.* (emphasis added).

32.     In November 2009, several months after the Pennsylvania budget impasse of 2009 had ended, the WHD issued a document available to the public entitled "Fact Sheet 70: Frequently Asked Questions Regarding Furloughs and Other Reductions in Pay and Hours Worked Issues." SF 12. It states in relevant part:

The following information is intended to answer some of the most frequently asked questions that have arisen when private and public employers require employees to take furloughs and to take other reductions in pay and / or hours worked as businesses and State and local governments adjust to economic challenges.

**1.     If an employer is having trouble meeting payroll do they need to pay non- exempt employees on the regular payday?**

In general, an employer must pay covered non-exempt employees the full minimum wage and any statutory overtime due on the regularly scheduled pay day for the workweek in question. Failure to do so constitutes a violation of the FLSA. When the correct amount of overtime compensation cannot be determined until sometime after the regular pay period, however, the requirements of the FLSA will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable.

…

**10.    Does it matter if the State or local government employee is considered an essential or critical employee for the purposes of a required furlough?**

The application of the FLSA is not affected by the classification of an employee as essential or critical for the purposes of a required furlough.

**11.    What remedies are available to correct violations of the FLSA when employees are not paid on a timely basis?**

> a.    The Secretary of Labor may bring suit for back wages and an equal amount as liquidated damages or for interest on the back wages ….
>
> …
>
> c.    An employee may file suit to recover back wages and an equal amount in liquidated damages, plus attorney's fees and court costs.

Ex. L, Fact Sheet 70, stamped US_MART0000315-18.  The Wage and Hour Division still makes the fact sheet available to the public and has not modified any of its responses to questions 1, 10, and 11.  SF 12.

**C.    Facts Related to Whether the Government Was Able to Calculate the Correct Amount of Overtime Compensation Before the Members' Regularly Scheduled Paydays**

33.    In response to Plaintiffs' interrogatories, the Government stated that it asked each agency with current or former employees who received notice of this action whether the agency had potential collective action members who worked overtime during the first week of the 2013 Government shutdown and, if so, whether the agency's human resources offices with responsibility for the agency's payroll systems were staffed with the necessary personnel to

accomplish payment of overtime to potential collective actions members during the 2013 Government shutdown, had funding been available or the agency was not otherwise legally prohibited from doing so. Based on their answers, only the Broadcasting Board of Governors ("BBG"), National Aeronautics and Space Administration ("NASA"), and Peace Corps lacked the necessary personnel during the shutdown to determine, compute, and arrange for the payment of overtime computation. Ex. N, Def's Response to Pls' Second Set of Interrogatories, at 3-5.

34. The BBG, NASA, and the Peace Corps employed 29, 3, and 6 Members, respectively, in October 2013. Lieder Decl., ¶ 6.

35. The Peace Corps had funds that may have been available to pay its employees on their regularly scheduled payday for work performed between October 1 and October 5, 2013, but personnel classified as excepted who might normally have been involved in the process of determining, computing or arranging for the payment of overtime compensation were not involved in activities related to determining, computing, or arranging for payment of overtime during the 2013 Government shutdown. Ex. N, Def's Response to Pls' Second Set of Interrogatories, at 8.

36. If these three agencies had had their normal complement of personnel determining, computing and arranging for the payment of overtime compensation during the 2013 Government shutdown, the agencies almost certainly would have been able to calculate and pay overtime compensation to Members by their regularly scheduled paydays, had the Government believed that the Anti-Deficiency Act did not bar the payments. In the six months before the shutdown, about 90% of BBG employees, over 99% of NASA employees, and 100% of Peace Corps employees who worked overtime received compensation on their regularly scheduled paydays. *Id.* at 6.

## IV.    SUMMARY OF THE ARGUMENT

This Court already has held that the Government violated the FLSA during the 2013 Government shutdown by not paying Members minimum wages, and with one possible limitation, by not paying Members overtime wages, on their regularly scheduled paydays.  Only two issues remain.  First, can the Government show that liquidated damages should be reduced or eliminated because it acted in good faith and had a reasonable basis for believing that it was complying with the FLSA when it failed to make timely payments of minimum and overtime wages?  Second, can the Government show that it was not able to compute by Members' regularly scheduled payday(s) the correct amount of compensation for any Members who worked overtime between September 29 and October 5, 2013?

### A.    The Government Is Liable for Liquidated Damages.

The FLSA mandates the payment of liquidated damages unless an employer has violated the FLSA in good faith and with a reasonable basis for believing that it was acting in compliance with the FLSA.  The Government did not consider, let alone seek legal advice concerning, whether withholding pay of employees required to work during the shutdown until the budget impasse ended would violate the FLSA.  Under numerous judicial precedents, the Government cannot establish that it acted in good faith when it failed to engage in any analysis of whether it was complying with the FLSA.  This failure is especially egregious because the Government employed the persons charged with interpreting the FLSA.  The stipulated facts establish that for at least 15 years prior to the 2013 Government shutdown, the Government's own Department of Labor had consistently taken the position through opinion letters, fact sheets and other communications that a State government violated the FLSA if it did not timely pay minimum

and overtime wages to its employees who were required to work during a budget impasse, even if provisions of State law prohibited payment until the State legislature had appropriated funds.

The Government also cannot establish a reasonable basis for believing that it was acting in compliance with the FLSA. Its only possible justification for not paying its employees on their regularly scheduled payday and only possible means of distinguishing its actions from State governments that fail to pay employees minimum and overtime wages during budget impasses is the federal Anti-Deficiency Act, 31 U.S.C. § 1341(a), which prohibits the Government generally from expending money "exceeding an amount available in an appropriation … for the expenditure." But, as the Supreme Court recently explained, the Anti-Deficiency Act "do[es] not affect the rights in this court of the citizen honestly contracting with the Government" and does not "cancel [the Government's] obligations." *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2193 (2012) (quoting *Dougherty v. United States*, 18 Ct. Cl. 496, 503 (1883) and *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892)). Because the Anti-Deficiency Act did not cancel the Government's obligations, including its obligation to make timely payments to its employees, it had to make arrangements to pay employees on a timely basis during the shutdown, as it did for members of the military, in order reasonably to believe that it was complying with the FLSA.

Finally, even if the Government could show that it acted in good faith and with a reasonable basis to believe that it was in compliance with the FLSA, the Court should not exercise its discretion to reduce, let alone eliminate, liquidated damages. Congress in 1974 decided to give federal employees rights under the FLSA, and, unlike with some other statutes, to do so in a manner that gave federal employees essentially identical rights to those possessed by employees of private, State and local employees. *See* 29 U.S.C. § 203(e)(2)(A). Any non-exempt employees of a private, State or local employee who received minimum or overtime

wages after their regularly scheduled payday would be entitled to liquidated damages. Federal employees should have the same remedy. Without an award of liquidated damages, they will have no remedy because, having eventually been paid, they are not entitled to compensatory damages.

**B.**     <u>The Government Does Not Qualify for the Exemption for Employers Unable to Determine the Amount of Overtime Compensation Due.</u>

The FLSA, as interpreted by the Department of Labor, exempts an employer from having to pay overtime on the payday for the dates on which the overtime was worked if the employer is unable to calculate the correct amount of compensation by that date. Courts interpret this exception as limited to circumstances beyond the employer's control, such as natural disasters. The shutdown was a decision of the defendant, akin to setting up an inadequately staffed accounting system for a single pay period. Thus, the exception does not apply at all.

Even if not having sufficient personnel to calculate overtime pay did justify a delay in payment, only three Agencies, at which only 38 of the Members worked, claim not to have had personnel to have calculated and made overtime payments if they had believed that it was legal to do so. And one of those agencies, the Peace Corps, did not have personnel to calculate and make those payments only because they had been assigned to other tasks during the 2013 Government shutdown. Only 32 Members worked at the Broadcasting Board of Governors and National Aeronautics and Space Administration, the other two agencies.

Finally, the fact that the great majority of agencies would have been able to calculate and pay overtime, had they considered it legal to do so, indicates that the Government cannot prove that it was unable to calculate the correct amount of overtime at BBG, NASA, and the Peace Corps. Rather, the Government's lack of personnel to calculate overtime compensation at those

three agencies was the product of the Government's own staffing choices, and it could have been in a position to calculate overtime pay at those agencies as well.

## V.   ARGUMENT

The Government bears the burden of proof on both issues before the Court:  whether liquidated damages should be reduced or eliminated, and whether it is not liable for overtime compensation because it could not determine that compensation by Members' regularly scheduled paydays.  As the Supreme Court has explained, "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance" partly or solely on the pleadings.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Here, obviously, Plaintiffs have gone far beyond the pleadings.  The greater burden in these circumstances is on the nonmoving party bearing the burden of proof.  "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.; accord Simanski v. Sec'y of HHS*, 671 F.3d 1368, 1379 (Fed. Cir. 2012).  Because the Government cannot meet that obligation as to either issue, summary judgment should be granted to Plaintiffs.

### A.   The Government Cannot Establish that It Is Entitled to the Reduction or Elimination of Liquidated Damages.

Employers that violate the FLSA's provisions are liable for the shortfall in timely minimum wage or overtime compensation[4] and an additional amount equal to that shortfall as

---

[4]   Plaintiffs' references to the Government's duty to pay overtime compensation to Members who worked overtime during the Affected Week is shorthand for paying both straight time pay for non-overtime hours and one and a half times employees' regular pay for overtime worked during that week.  *See White v. Davis*, 30 Cal. 4th 528, 577 (Cal. 2003) ("whenever a nonexempt employee works overtime, the FLSA requires the employer to pay the employee his

liquidated damages.  29 U.S.C. § 216(b).  The liquidated damages provision "constitutes a Congressional recognition that failure to pay the statutory minimum on time may be so detrimental to maintenance of the minimum standard of living 'necessary for health, efficiency, and general well-being of workers' and to the free flow of commerce, that double payment must be made in the event of delay in order to insure restoration of the worker to that minimum standard of well-being." *Brooklyn Sav. Bank*, 324 U.S. at 707 (1945) (quoting 29 U.S.C. § 202(a)); *see Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583–84 (1942) (explaining that liquidated damages are intended to compensate employees for the losses they may have suffered as a result of not receiving the proper wages at the time they were due).

Courts may award less than full liquidated damages only if the employer shows that it acted "in good faith and that [it] had reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA]."  29 U.S.C. § 260; *see Abbey v. United States*, 106 Fed. Cl. 254, 265 (2012), *rev'd on other grounds*, 2014 U.S. App. LEXIS 5303 (Fed. Cir. Mar. 21, 2014). There is a "strong presumption under the statute in favor of doubling." *Angelo v. United States*, 57 Fed. Cl. 100, 104 (2003) (quotations omitted).  The employer's burden to establish its good faith and the reasonable grounds for its action is "substantial." *Abbey*, 106 Fed. Cl. at 265 (quoting *Adams v. United States*, 350 F.3d 1216, 1226 (Fed. Cir. 2003)).  A court may, but is not required to, reduce or eliminate the amount of liquidated damages only when the employer meets both conditions.  Otherwise, the court must award full liquidated damages. *See id*. (quoting 29 C.F.R. § 709.22(b)).

---

or her *full regular salary* for the employee's straight time as well as at least one and one-half times the employee's regular salary for overtime hours worked") (emphasis in original).

In this case, the Government must attempt to meet its "substantial" burden by arguing that even though the Anti-Deficiency Act, 31 U.S.C. § 1341 *et seq.,* did not relieve the Government of its obligations under the FLSA, its compliance with the Anti-Deficiency Act should relieve it of the obligation to pay liquidated damages and thereby deprive Members of any remedy in this case. In effect, the Government must show that (a) it ignored its obligations under the FLSA based on the Anti-Deficiency Act in good faith, (b) it had reasonable grounds for believing that its actions did not violate the FLSA, and (c) its actions warrant reduction or elimination of liquidated damages. The stipulated and undisputed facts show that it cannot meet even one of those three elements, let alone all three of them. Accordingly, the Court should grant partial summary judgment to Plaintiffs as to the award of liquidated damages.

**1.      The Stipulated and Undisputed Facts Establish that the Government Did Not Act in Good Faith.**

**a.      The Government did not act in good faith because it did not attempt to ascertain what the FLSA required and attempt to comply with the requirement.**

"Good faith" is subjective. The defendant must establish "'an honest intention to ascertain what the [FLSA] requires and to act in accordance with it.'" *Moreno v. United States*, 88 Fed. Cl. 266, 277 (2008) (quoting *Beebe v. United States*, 640 F.2d 1283, 1295 (Ct. Cl. 1981). To show good faith, the Government must engage in "active steps to ascertain the dictates of the FLSA and then act to comply with them." *Angelo v. United States*, 57 Fed. Cl. 100, 105 (2003) (citing *Herman v. RSR Sec. Servs.,* 172 F.3d 132, 142 (2d Cir. 1999)). Indeed, in *Angelo*, the Court quoted with approval plaintiff's argument that the Government must "state meaningful facts that demonstrate that it attempted to ascertain the requirements of the FLSA and to act in accordance with it." *Id.*

The Government cannot meet the requirement that it engage in "active steps to ascertain the dictates of the FLSA," let alone "state meaningful facts that demonstrate" that it met this requirement. The Government admits that: (a) the agencies that advise the Government on the implementation of labor law and policy did not prior to or during the 2013 Government shutdown consider whether requiring Affected Employees to work during the Affected Week without paying them minimum or overtime wages on their regularly scheduled paydays for that work would violate the FLSA; (b) it is unaware of any other agency that considered the issue prior to or during the 2013 Government shutdown; and (c) it did not seek a formal legal opinion regarding how to meet its obligations under both the Anti-Deficiency Act and FLSA as to Affected Employees who were required to work during the shutdown. Facts 14, 15 *supra*. Not considering the dictates of the FLSA, and not seeking a legal opinion, are the very opposite of actively attempting to ascertain the FLSA's requirements.

By contrast, in *Angelo*, the Government made at least some attempt to ascertain the FLSA's requirements. An official designated a position as exempt based on the position descriptions and applicable regulations. 57 Fed. Cl. at 106. But she acknowledged in her deposition that she did not inquire whether the employees in that position actually satisfied one of the elements for the exemption. *Id.* at 106. Now-Senior Judge Damich did not have to definitively rule on good faith, but concluded that "[i]t seems at least superficially evident that Ms. Robinson's admittedly limited inquiry does not even meet the good faith test." *Id.* at 107. If such a limited effort is inadequate to establish good faith, no effort at all certainly is inadequate. *See also Moreno*, 88 Fed. Cl. at 279-80 (holding that the Department of Homeland Security did not act in good faith in not reclassifying employees during the period between issuance of a draft set of Q&As by the Office of Personnel Management ("OPM") or using that time to "deliberat[e]

over the legal issues in the Q&A" or to "endeavor[] to determine its legal obligations under the FLSA").

### b. The Anti-Deficiency Act did not exempt the Government from meeting the "good faith" element in order to obtain a reduction or elimination of liquidated damages.

Thus, the Government must contend that the Anti-Deficiency Act's provisions exempted it from having to attempt to determine the dictates of the FLSA because it could not have paid the excepted, non-exempt employees regardless of what it determined its obligations under the FLSA to be. Any such argument should be rejected for four reasons.

### i. There are no special rules for public employers.

The FLSA's language does not contain any special rules for public entities in applying the prompt payment and "good faith" requirements. *See Caldman v. California*, 852 F. Supp. 898, 902 (E.D. Cal. 1994) (rejecting argument that State of California should not be liable for liquidated damages to employees not paid promptly as a result of budget impasse because, "[a]lthough the FLSA and its accompanying regulations distinguish between private and public employers in a few respects … nothing in the FLSA or in the relevant regulations indicates that public employers are not subject to the timely payment requirement of the FLSA"). Similarly, the Anti-Deficiency Act does not create exceptions to Governmental obligations. In the words of the Supreme Court, the Anti-Deficiency Act does not "cancel [the Government's] obligations." *Salazar*, 132 S. Ct. at 2193.

### ii. Agencies failed to attempt to attempt to pay their employees in compliance with the FLSA.

If the executive agencies had considered their obligations under the FLSA before October 1, or even during the early days of the shutdown, they would have had at least three choices. First, they could have furloughed all employees, although that would have raised concerns about

health and safety. Second, it could have proposed amendment of the bill that became POMA, or adoption of a new statute, to extend POMA's protections to all excepted, non-exempt employees. Instead, the agencies took no action to try to protect these employees. Facts 16, 17 *supra*. Obviously, it is impossible to know what Congress would have done if legislation had been proposed, but, as the Supreme Court reaffirmed only last month, employees should not be deprived of a remedy when their employer violated its obligations under the FLSA. *See Tyson Foods, Inc. v. Bouaphakeo*, 194 L. Ed. 2d 124, 135-36 (2016) (holding that employees should be able to use representative testimony to prove liability and damages when employer failed to meet statutory duty to maintain accurate records of hours worked, and explaining that "the 'remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making' the burden of proving uncompensated work 'an impossible hurdle for the employee'"); *see also Hoffmann-La Roche Inc. v. Sperling*, 493 U. S. 165, 173 (1989) ("The broad remedial goal of the statute should be enforced to the full extent of its terms"). Third, it could have accepted that it would have to pay liquidated damages to employees required to work. It never chose among the alternatives because it never considered its obligations under the FLSA at all.

### iii. Congress failed to ensure that employees were paid in compliance with the FLSA.

Congress is part of the United States Government, the defendant. The Government should not be allowed to contend that the "good faith" requirement for eligibility for reduction or elimination of liquidated damages should be ignored when it – including its legislative branch – created the situation in which excepted employees were required to work without the possibility of prompt compensation. Legislative gridlock does not trump the FLSA. Under remarkably similar facts, a federal district court concluded that the State of California did not act in good faith, and was liable for liquidated damages, even though its legislature prohibited payments to

employees without appropriations and then failed to pass appropriations because of a budget impasse resulting in employees working without prompt payment.

In 1990, California paid its employees two weeks late because a budget impasse meant no funds were appropriated for the payment of salaries on employees' scheduled payday. *Biggs v. Wilson* (*"Biggs II"*), 1 F.3d 1537, 1538 (9th Cir. 1993). On cross-motions for summary judgment, the district court ruled that the delays in payments made the defendants liable for violating the FLSA, but held for two reasons that they were not liable for liquidated damages. The plaintiffs had sued only the Governor and various other officials and not the State, and the FLSA "imposes liability for liquidated damages upon the employer who violates sections 206 [minimum wage] or 207 [overtime]; it imposes no liability upon the officers of the employer." *Biggs v. Wilson* (*"Biggs I"*), 828 F. Supp. 774, 779 (E.D. Cal. 1991), *aff'd Biggs II*, 1 F.3d 1537 (9th Cir. 1993). Moreover, defendants produced evidence of the state's "efforts to comply with FLSA … reflect[ing] an honest intention to ascertain the requirements of the FLSA and to act accordingly," but the situation in which a government does not pay employees promptly because of a budget impasse "appears to be one of first impression." *Id.* The plaintiffs did not appeal the denial of liquidated damages, so the issue was not before the Ninth Circuit. *Biggs II*, 1 F.3d at 1538 & n.3.

In 1992, two years after the events giving rise to *Biggs*, California had another budget impasse, again resulting in certain employees being paid late because no money had been appropriated. This time, the district court concluded that California did not act in good faith, and that liquidated damages were appropriate, because "[a]n employer's failure to heed administrative rulemaking or precedent with respect to the FLSA deprives the employer of the good faith defense," and the *Biggs* decisions put California on notice "that its failure to issue

prompt payment to plaintiffs would violate the FLSA." *Caldman*, 852 F. Supp. at 901-02. The *Caldman* court rejected the State's defense, similar to the Anti-Deficiency Act defense raised by the Government in this case, that "the California Constitution and statutes absolutely preclude payment of claims without legislative appropriation." *Id.* at 902. The presence of statutory provisions prohibiting payments in the absence of an appropriation, and the resultant need for legislative action in order to pay employees timely, should no more shield the United States from a lack of good faith determination in this case than they shielded California from a lack of good faith determination in *Caldman*.[5]

The situation in *Caldman* was analogous to the situation in this case in a second way. In 1992, the California legislature provided for the "continued payment of most State employees despite the absence of a budget," but not employees in the position of the plaintiffs, who provided in-home supportive services. *Id.* at 901 n.5. Similarly, in 2013 Congress provided for payments to certain employees – members of the Armed Forces and civilian employees who supported them – but not to other employees, such as prison correctional officers, air marshals, and federal police and firefighters who provide services that involve "the safety of human life or the protection of property." 31 U.S.C. § 1342. In this case, as in *Caldman*, the legislature's

---

[5]     The vacuity of any argument that the Anti-Deficiency Act relieved the Government of the obligation to actively try to ascertain and comply with its obligations under the FLSA also is shown by a hypothetical. Suppose a private partnership has an agreement that no employee may be paid unless both partners agree on the budget for the year. The partners disagree about the budget. The employees continue working, but without receiving payment on a timely basis. A court would reject out of hand a defense that the partners acted in good faith because they could not pay their employees under their agreement so there was no need to consider their obligations under the FLSA. Nothing in 29 U.S.C. § 260, or the remainder of the FLSA, suggests that Congress intended the United States to prevail on the "good faith" element by making the same argument.

provision for payment only to favored employees supports the conclusion that the defendant did not act in good faith toward the plaintiffs.

### iv. The DOL was aware that the Government was violating the FLSA.

One of the two Government agencies charged with interpreting the FLSA, the Department of Labor, was fully aware of and endorsed the *Biggs* and *Caldman* decisions. In its 1998 opinion letter, the DOL relied expressly on those two decisions in opining "that failure to pay [state] employees required minimum wage and overtime premiums …on the regularly scheduled payday for the work performed – constitutes a violation of the FLSA, notwithstanding an employer's later payment of all wages due plus an equal amount as liquidated damages." Fact 20 *supra*. The DOL cited the *Biggs* and/or *Caldman* decisions in letters to representatives of Pennsylvania in 2007 and 2009 in explaining that failure to pay its employees minimum and overtime wages on a timely basis for work they performed would violate the FLSA, notwithstanding any state law prohibition against payment until moneys had been appropriated, and potentially subject the State to liquidated damages. Facts 23, 31 *supra*.[6] In internal communications DOL employees repeatedly assumed that Pennsylvania would be liable for liquidated damages. Facts 26, 27 *supra*. Without mentioning *Biggs* or *Caldman*, the DOL placed on the Internet a fact sheet stating that an employee, including a public employee, who has not been paid minimum or overtime wages on a timely basis "may file suit to recover back wages and an equal amount in liquidated damages, plus attorney's fees and court costs." Fact 32 *supra*.

---

[6] If the State's employees had chosen to sue for liquidated damages, they may have faced defenses based on sovereign immunity (depending on the scope of Pennsylvania's waiver of that immunity) and on the Eleventh Amendment.

In sum, since at least 1998, the Wage and Hour Division of the DOL has interpreted the FLSA as follows:

a. The failure to pay employees of State government required minimum wage and overtime premiums when due – *i.e.*, on the regularly scheduled payday for the work performed – constitutes a violation of the FLSA;

b. The prompt payment requirement applies to State governments during a budget impasse, whether or not there is a provision of state law that limits expending non-appropriated funds; and

c. Employees may recover liquidated damages pursuant to 29 U.S.C. §§ 216(b) and 260 as a result of a state or local government's failure to pay them minimum wages and overtime wages for work performed during a pay period on their regularly scheduled payday for that period.

Fact 19 *supra*.

Here, where the employer – the Government – has the duty to ascertain whether it is acting in compliance with the FLSA, the Government should be charged with the knowledge and opinions of the DOL. *See J.A. Jones Constr. Co. v. United States*, 182 Ct. Cl. 615, 625-28 (1968) (although "a truly independent federal agency should not be charged with knowledge of what another is doing simply because both are components of the same Federal Government," one agency should be charged with the knowledge of the other when the first is acting as the agent of the second); *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 796 (E.D.N.Y. 1985) ("the knowledge of employees of one [government] agency may be imputed to those of another if there is some relationship between the agencies—either some reason for the agency without knowledge to seek the

information or a reason for the knowledgeable agency to transmit the information"). Charged with that knowledge, the Government cannot possibly have acted in good faith in creating and doing nothing to avert the situation in which excepted, non-exempt employees were required to work without provision for payment of minimum or overtime wages on their regularly scheduled paydays.

2. **The Stipulated and Undisputed Facts Establish that the Government Did Not Have a Reasonable Basis for Believing that It Was Complying with the FLSA.**

The inquiry into whether the government had reasonable grounds for believing that it was complying with the FLSA is objective. "Proof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is in conformity with the Act, even though his belief is erroneous." *Beebe*, 226 Ct. Cl. at 328. The Government cannot avoid liquidated damages under this prong of 29 U.S.C. § 260 because it admits that, in 2013, it did not have any belief concerning whether it was acting in conformity with the FLSA. Instead, it did not even consider whether requiring Affected Employees to work during the Affected Week without paying them minimum or overtime wages on their regularly scheduled paydays for that work would violate the FLSA. Fact 14 *supra*. "It is senseless to ask if an employer had reasonable grounds for believing something it did not believe," *Thomas v. Howard Univ. Hosp.*, 39 F.3d 370, 373 (D.C. Cir. 1994), or in this case did not consider. But if having reasonable grounds for not considering whether its actions were a violation of the FLSA is sufficient to meet the "reasonable grounds for believing" requirement, the Government still cannot avoid liquidated damages because it cannot show that the law in 2013 was uncertain, ambiguous or complex.

By 2013, the holdings in *Biggs* and *Caldman* were accepted not only by the DOL, but also by every appellate court to have considered whether a state or local government violated the FLSA and faced the possibility of liquidated damages if it did not pay its employees minimum

and overtime wages on their regularly scheduled paydays.  *See Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 135-36 (3d Cir. 1999); *White v. Davis*, 30 Cal. 4th at 577; *Council 13*, 604 Pa. at 379.  The Government therefore must argue that uncertainty arose because the same doctrine had not yet been applied to delays in payment by the federal government, which was subject to the Anti-Deficiency Act.  That argument is flawed because neither the FLSA nor the Anti-Deficiency Act justifies any deviation in outcome from the cases dealing with state budget impasses.

The statutory language of the FLSA makes no relevant distinctions between the Federal Government and state governments.  The same amendment, in 1974, brought both federal and state governments under the FLSA, by expanding the definition of an "employer" to include a "public agency" and of an "employee" to include specified categories of individuals employed by a "public agency."  29 U.S.C. § 203(d), (e)(2); *see* Pub. L. 93-259, §§ 6(a), 13(e), 88 Stat. 58, 64 (April 8, 1974).  The great majority of the minimum wage and overtime provisions do not distinguish between state governments and the Federal Government, and none of the State-specific provisions make a difference as to the "reasonable basis" requirement.  *See* 29 U.S.C. § 207(o), (p) (provisions concerning maximum hours per week for State fire and law enforcement employees and concerning compensatory time for State employees).  Most important, the provision dealing with the possible reduction or elimination of liquidated damages for an employer found to have violated the FLSA applies to "the employer," without making any distinctions among Federal, state or private employers.  29 U.S.C. § 260.

Similarly, the Anti-Deficiency Act does not differ materially in its terms from the California laws giving rise to *Biggs*, *Caldman*, and *White v. Davis*, or the Pennsylvania laws giving rise to the facts in paragraphs 23-31 above and the decision in *Council 13.*  Like the Anti-

Deficiency Act, California and Pennsylvania law prohibited expenditures of money that had not been appropriated, including for employee compensation.

Consequently, the Government must try to distinguish the decisions dealing with State employees by contending that the courts must try to harmonize the FLSA with the Anti-Deficiency Act because they are both Acts of Congress, whereas the state laws were products of inferior sovereigns that the FLSA preempted insofar as those laws purported to prohibit the States from making timely payments of minimum wages and overtime compensation. *See Council 13*, 604 Pa. at 383. Obviously, to the extent that State law is preempted, the employer's obligations under the FLSA are unaffected. But the Supreme Court and the Court of Claims made clear prior to 2013 that the obligations imposed on employers by the FLSA also are unaffected by the Anti-Deficiency Act, and thus, the preemption of State law is not a meaningful distinction.

The Supreme Court addressed the impact of the Anti-Deficiency Act just one year before the 2013 Government Shutdown. In *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181 (2012), the Court held that the Secretary of the Interior must pay the full amount of "contract support costs" to a Native American tribe, as mandated by the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. § 450 *et seq.*, when Congress had not appropriated sufficient funds to pay the aggregate "contract support costs" incurred on all contracts by all tribes. *Id.* at 2190-91. The Court rejected the Government's argument that its holding could cause the Secretary to violate the Anti-Deficiency Act. "[A] predecessor version of that Act was in place when *Ferris [v. United States*, 27 Ct. Cl. 542 (1892)] and *Dougherty [v. United States*, 18 Ct. Cl. 496 (1883)] were decided … and the Government did not prevail there. As *Dougherty* explained, the Anti-Deficiency Act's requirements 'apply to the official, but they do not affect

the rights in this court of the citizen honestly contracting with the Government.' 18 Ct. Cl., at 503; *see also Ferris*, 27 Ct. Cl., at 546 ('An appropriation per se merely imposes limitations upon the Government's own agents; . . . but its insufficiency does not pay the Government's debts, nor cancel its obligations')." *Id.* at 2193.

The *Salazar* holding relied heavily on the decisions in *Ferris* and *Dougherty*. In the former case, a government agent halted a contractor's dredging work on the Delaware River when the Congressional appropriation ran out, depriving the contractor of expected profits. 27 Ct. Cl. at 545-46. The contractor sued, and Court of Claims awarded it damages. The Court explained that the exhaustion of the appropriation "justified the officer in charge [in stopping the dredging work], but does not justify the defendants in not providing funds for carrying out and discharging their legal obligations." *Id.* at 546. It later continued, in the language quoted by the Supreme Court, that "[a]n appropriation *per se* merely imposes limitations upon the Government's own agents; it is a definite amount of money [e]ntrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties." The Court in *Ferris* relied largely on its prior decision in *Dougherty*. In that case, a supplier of beef rations for Native American tribes under an oral contract similarly prevailed over the defense that the appropriation had been exhausted; "[t]he statutory restraints in this respect apply to the official, but they do not affect the rights in this court of the citizen honestly contracting with the Government." 18 Ct. Cl. at 503.

Although the Members are employees rather than independent contractors, they performed work for the Government just like the plaintiffs in *Salazar*, *Ferris* and *Dougherty*. Like the tribes in *Salazar*, their rights to certain payments were protected by federal statute.

And, most important, their right to liquidated damages when FLSA-mandated payments are delayed should be unaffected by the Anti-Deficiency Act.

### 3. The Court Should Not Reduce, Let Alone Eliminate, Liquidated Damages Under the Facts of this Case.

Even if the Government could show that it acted with good faith and a reasonable basis for believing that it was complying with the FLSA – which it cannot, as demonstrated in the prior two subsections –

> the liquidated damages award does not automatically vanish, but instead falls within the discretion of the court which may award some amount of liquidated damages less than the full "double damages" or, alternatively, no liquidated damages at all. *29 U.S.C. § 260*. As this court has noted, "there is a 'strong presumption under the statute in favor of doubling.'" *Angelo, 57 Fed. Cl. at 104* (quoting *Shea v. Galaxie Lumber, 152 F.3d 729, 733 (7th Cir. 1998))*.

*Huggins v. United States*, No. 95-285 C, 2005 U.S. Claims LEXIS 525 (Fed. Cl. Aug. 16, 2005).

In this case, liquidated damages are the Members' only remedy (other than an award of attorneys' fees and costs to their counsel); they have no compensatory damages because they were paid for work performed after the shutdown ended.  Facts 10, 11 *supra*.  If liquidated damages are eliminated, the Members will receive nothing for the injuries that they suffered as a result of the Government's violation of the FLSA.

Because liquidated damages are mandatory unless the employer shows good faith and a reasonable basis for believing that it was acting in compliance with the FLSA, Plaintiffs have no obligation to show harm in order to be awarded liquidated damages.  29 U.S.C. § 260.  For that reason, they have chosen not to clutter the records with hundreds of declarations from Members.  Nonetheless, Plaintiffs have presented declarations from several Members describing the hardships that they suffered as a result of the 2013 Government shutdown and consequent delay in payments and uncertainty about when the next paycheck would arrive.  Fact 12.  The Court

previously has noted "that at least some government employees, who may be plaintiffs herein, were working at the GS-04 or GS-05 levels, and had annual salaries starting around $28,000 in 2013. Such salaries leave families a narrow margin, particularly when—as plaintiffs in this action have described—child care expenses continue and unexpected health-related expenses arise." Op. and Order, July 31, 2014, ECF No. 38, at 13 n.11 (citations omitted). The Government has chosen not to conduct any depositions and is not in a position to contradict that at least some Members suffered economic hardships as a result of the 2013 Government shutdown. Fact 12 *supra.*

Making amends for these types of hardship are the reason that Congress provided for liquidated damages. As quoted above, the Supreme Court has held that delay in payment may be "detrimental to maintenance of the minimum standard of living 'necessary for health, efficiency, and general well-being of workers,'" *Brooklyn Sav. Bank*, 324 U.S. at 707, and that liquidated damages are intended to compensate employees for the losses they may have suffered as a result of not receiving the proper wages at the time they were due. *Overnight Motor Transp. Co. v. Missel*, 316 U.S. at 583–84.

It is especially appropriate to award liquidated damages when they are the sole remedy available. The FLSA should be "construed liberally to apply to the furthest reaches consistent with congressional direction." *Mitchell v. Lublin*, 358 U.S. 207, 211 (1959). Courts have applied this principle in a wide variety of contexts in ruling in favor of employees. *See, e.g., id.* at 211-12 (holding that employees are "engaged in commerce" and hence protected by FLSA); *Prickett v. Dekalb County*, 349 F.3d 1294, 1296 (11th Cir. 2003) (holding that employees opted in to entire action so that they did not have to file new consents to join when complaint was amended to add a new claim); *Pickett v. Beard*, Case No. 1:13-CV-0084 AWI BAM, 2014 U.S.

Dist. LEXIS 15066, at *20 (E.D. Cal. Feb. 5, 2014) (holding that attorneys' fees are available to prevailing plaintiff who seeks only declaratory relief). The same principle requires an award of unreduced liquidated damages in this case.

B. **The Government Cannot Establish that It Was Unable to Compute the Correct Compensation for Overtime Worked by Members During the 2013 Government Shutdown by Their Regular Paydays.**

In identifying whether the Government could determine, compute, or arrange for the payment of overtime compensation during the 2013 Government shutdown as an open issue, the Court relied on a DOL interpretative bulletin that states that generally "overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends." July 31, 2014 Op. and Order at 18 (quoting 29 C.F.R. § 778.106). That bulletin goes on to explain:

> When the correct amount of overtime compensation cannot be determined until some time after the regular pay period, however, the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next pay day.

*Id.*[7]

Judicial decisions establish that the phrase "cannot be determined" means circumstances beyond the employer's reasonable control. "Although this Court agrees that natural disasters or similar events wholly beyond the control of the employer may in proper circumstances allow an employer to make late payments without violating the FLSA, this case does not present such exceptional circumstances. The delay in payment was due to bureaucratic inertia in setting up its own accounting procedures. An employer may not set up an inefficient accounting procedure

---

[7]    The OPM has not issued any guidance concerning the timing of overtime payments.

and then claim it is not responsible for timely payment of wages due to its own incompetence." *Dominici v. Bd. of Educ.*, 881 F. Supp. 315, 320 (N.D. Ill. 1995); *see Ortega v. Due Fratelli, Inc.,* 2015 U.S. Dist. LEXIS 161053, *23-24 (N.D. Ill. Dec. 1, 2015) ("This must be an "exceptional circumstance" not caused by an employer ...."); *Powers v. Centennial Communs. Corp.*, 679 F. Supp. 2d 918, 924 (N.D. Ind. 2009) (finding violation because employer provides no evidence that the "delay in overtime payment is due to some difficulty in crunching the numbers or other pragmatic considerations"); *Cahill v. City of New Brunswick*, 99 F. Supp. 2d 464, 475 (D.N.J. 2000) (explaining that whether an employer qualifies for the "cannot be determined" exemption depends on factors such as the period of time "reasonably necessary" to make the calculations and "whether the delay in payment was due to neglect by the ... defendant City"; "mere bureaucratic inertia is no excuse for late payment or nonpayment of wages").

In this case, the delay in payment of overtime was not caused by inherent difficulties in calculating employees' overtime hours or by a natural disaster. Rather, it was caused by the Government itself in the form of a budgetary disagreement. Just as "[a]n employer may not set up an inefficient accounting procedure and then claim it is not responsible for timely payment of wages due to its own incompetence," so too an employer should not be allowed to shut down its accounting system due to its own squabbling and then claim it cannot timely pay wages.

But even if inability to calculate and process overtime payments because of a budgetary impasse could qualify as not being able to determine the amounts on a timely basis, only three agencies at most, at which only 38 Members worked, even arguably fall under the exemption. They are the only agencies with Affected Employees who worked overtime during the first week of the 2013 Government shutdown that claim that inadequate staffing during the shutdown made it impossible to pay overtime compensation to those Affected Employees, had funding been

available and had the agencies believed that they were legally allowed to do so.  Facts 33, 34 *supra*.  Moreover, at the Peace Corps, with six of those Members, persons who might have been involved in the process of determining, computing or arranging for the payment of overtime compensation worked during the 2013 Government shutdown but not in the operations related to payment of overtime compensation.  Fact 35 *supra*.[8]

The fact that the great majority of agencies do not claim that they would have been unable to determine overtime compensation on Members' regularly scheduled paydays, had funding been available, suggests that the different position of the BBG, NASA and the Peace Corps was a product of decisions made by those three agencies and was not dictated by the terms of the shutdown.  This provides another basis for concluding that any inability to determine overtime compensation was not due to circumstances beyond the reasonable control of those three agencies or the Government.

## **CONCLUSION**

Based on the undisputed and largely stipulated facts, Plaintiffs are entitled to partial summary judgment on the two outstanding issues:  whether Members are entitled to liquidated damages, and whether the Government was able to determine the overtime compensation for Members during the 2013 Government shutdown.  The Court should grant Plaintiffs' motion, and instruct the parties to propose a means of resolving the compensation to which each Member is entitled.

---

[8] The Government cannot show that, if the three agencies had had their normal complement of personnel determining, computing and arranging for the payment of overtime compensation during the 2013 Government shutdown, they still could not have determined overtime payments by Members' regularly scheduled paydays.  In the six months before the shutdown, about 90% of BBG employees, over 99% of NASA employees, and 100% of Peace Corps employees who worked overtime received compensation on their regularly scheduled paydays.  Fact 36 *supra*.

April 21, 2016                    Respectfully submitted,


                                  /s/ Heidi R. Burakiewicz
                                  Heidi R. Burakiewicz
                                  Mehri & Skalet, PLLC
                                  1250 Connecticut Avenue NW, Suite 300
                                  Washington, D.C. 20036
                                  (202) 822-5100 (phone)
                                  (202) 822-4997 (fax)
                                  hburakiewicz@findjustice.com

                                  Counsel of Record for Plaintiffs


                                  Steven A. Skalet
                                  Michael Lieder
                                  Mehri & Skalet, PLLC
                                  1250 Connecticut Avenue NW, Suite 300
                                  Washington, D.C. 20036
                                  (202) 822-5100 (phone)
                                  (202) 822-4997 (fax)
                                  sskalet@findjustice.com
                                  mlieder@findjustice.com

                                  Of Counsel for Plaintiffs